# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 10, 2012

## STATE OF TENNESSEE v. WILLIAM ROBINSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-03863      J. Robert Carter, Judge**

---

**No. W2011-00748-CCA-R3-CD  - Filed April 17, 2012**

---

The defendant, William Robinson, was convicted by a Shelby County Criminal Court jury of voluntary manslaughter and was sentenced by the trial court to five years, suspended to nine months in the county workhouse with the remainder of the time on supervised probation. His sole issue on appeal is whether the evidence was sufficient to sustain his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Stephen Bush, District Public Defender; Phyllis Aluko (on appeal) and Jane Sturdivant and Sanjeev Memula (at trial), Assistant Public Defenders, for the appellant, William Robinson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and David Zak and Marlinee Iverson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the shooting death of the victim, David McMahan, which occurred at the hands of the defendant outside a Memphis Mapco service station on the night of January 10, 2008. According to the State's proof at trial, the defendant and Heather Yelverton, who was the victim's former girlfriend and the mother of his five-year-old child, arrived together at the service station in Yelverton's vehicle. As Yelverton waited in the driver's seat for the defendant to make his purchases, the victim and a woman named Dena

Wiesner pulled up to the station. The victim approached Yelverton's vehicle, banged on her passenger window, and yelled threats to her. She drove off to get away from him, and he returned to Wiesner's vehicle and was preparing to get into the passenger seat when the defendant exited the store. At that point, the victim approached the defendant, yelling obscenities. The two men exchanged words, and the defendant pulled out his gun. The victim threw his arms wide open and taunted the defendant to go ahead and shoot. The defendant responded by firing multiple gunshots at the victim, killing him. The defendant was arrested at the scene and subsequently charged with the voluntary manslaughter of the victim.

At trial, Heather Yelverton testified that she and the victim, who had dated for approximately seven years, were taking a break in their relationship at the time the shooting occurred. She said that when she and the defendant arrived at the Mapco station, the defendant got out of the passenger seat of her vehicle and went into the store while she waited in her vehicle. As she sat there, she saw the victim pull up to the station in a vehicle driven by Wiesner. The victim got out of Wiesner's car, approached her vehicle, and banged on her passenger side window until she moved her vehicle away from him. Yelverton said that the victim had returned to Wiesner's car and was about to get inside when the defendant walked out of the store. Wiesner pointed the defendant out to him, and he then started toward the defendant, yelling obscenities.

Yelverton testified that she assumed the two men exchanged words, although she was unable to hear exactly what was said. She did, however, hear the victim yell to the defendant, "[W]hat[,] are you going to shoot me, bitch? Shoot me." She then saw the victim throw his arms open wide and continue advancing toward the defendant. The next thing she saw was "fire" coming out of the defendant's gun and the victim on the ground. At that point, she jumped out of her vehicle, ran to the victim, and "held him while he died."

On cross-examination, Yelverton acknowledged having given a statement to police at the time of the shooting but claimed that it contained inaccuracies. She acknowledged as accurate the portions of her statement in which she said that the victim had been harassing her before the shooting, that he had screamed at her and threatened her when she was in her vehicle, and that the defendant had backed away from the victim while the victim continued to advance toward him. She further acknowledged that she probably reported that the victim, while confronting her at the vehicle, also threatened the defendant and his mother. She was adamant, however, that she never reported that the victim reached down in his pants as if he had a sawed-off weapon before the defendant shot him.

Carlotta Curtis, who was working at the Mapco store at the time of the shooting, testified that the defendant walked into the store, purchased a pack of cigarettes, and left.

Less than five minutes later, the defendant came back into the store and asked her to call 9-1-1, saying, "[H]e was trying to hurt me and I shot him." The defendant then walked back out and sat down in front of the door. Curtis identified the store's surveillance videotape that recorded three different views of the interior and exterior store at the time of the shooting, which was subsequently admitted as an exhibit and played for the jury.

Dena Wiesner testified that she had two children with the victim's brother and had known the victim since he was about fourteen. She was also acquainted with the defendant, having met him through a mutual friend. On the night of the shooting, she picked up the victim at his aunt's house to take him by the tattoo shop where the defendant worked because he wanted to see if Yelverton's vehicle was there. En route, the victim spotted Yelverton's vehicle at the Mapco station and instructed her to pull over. He then got out of the car, walked to Yelverton's vehicle, and attempted to talk to her. Yelverton, however, drove off.

Wiesner testified that the victim had started back to her vehicle when the defendant exited the store. At about the same time, Yelverton came back around in her vehicle as if to pick up the defendant. The victim saw the defendant, said, "[T]hat's that nigger right there," and started toward him. Wiesner said she "guess[ed]" that the defendant pulled his shirt up to show the victim his gun, because the victim stopped and said, "[Y]ou're going to kill me or shoot me?" right before the defendant shot him. Wiesner testified that the victim was not armed and that the only thing he had with him was his cell phone. On cross-examination, she acknowledged that the victim stopped at the service station in order to confront Yelverton, with whom he had been arguing. She further acknowledged that he was angry when he approached the defendant, whom he believed to be romantically involved with Yelverton.

John Daniels, Jr., a retired Shelby County Sheriff's Department deputy, pulled up to the station in time to witness the latter part of the shooting. He testified that he was looking up to check the gas prices when he heard a gunshot, looked down, and saw a white male firing a pistol at another white male. As he watched, the gunman fired two more shots at the victim, who fell backwards onto the ground. The gunman then looked at Daniels before walking up to the victim and firing a final shot at him as he lay on the ground. Daniels testified that he did not see the victim with any kind of weapon. On cross-examination, he acknowledged that he did not witness the events leading up to the shooting.

At the time of the shooting, Sergeant Kelvin Hailey of the Memphis Police Department, who was assigned to the Organized Crime Unit, was driving past the Mapco Station in an unmarked patrol car. Sergeant Hailey testified that he heard what he thought were three or four gunshots, looked over, and saw the victim lying on his back on the ground while the defendant stood over him pointing his hand at him. He said that the defendant was no longer in sight by the time he was able to pull into the station but that he reappeared soon

afterwards, walking toward him armed with a handgun. He ordered him to drop the weapon and get onto the ground, and the defendant complied. Sergeant Hailey acknowledged that the defendant did not attempt to flee and was cooperative with him.

Lieutenant Gerald Paige of the Memphis Police Department, who was assigned to the Crime Scene Unit at the time of the shooting, identified various photographs and evidence collected in the case, including a diagram that depicted the location where six .45 caliber shell casings were recovered from the ground outside the store. He also identified the six shell casings, as well as a .45 caliber Glock handgun and two magazine clips, that were recovered from the scene.

Shelby County Assistant Medical Examiner Dr. Miguel Laboy testified that he determined that the cause of the victim's death was multiple gunshot wounds based on his autopsy of the body, which revealed three gunshot wounds: one in which the bullet traveled through the victim's arm and entered the soft tissue of his chest; one in which the bullet entered the left side of the victim's chest and perforated his abdominal cavity; and one in which the bullet entered the victim's right back. He said that the victim's body tested positive for the presence of marijuana but negative for alcohol or any other drugs.

The defendant elected not to testify in his own defense, and the final evidence presented in the case was the parties' stipulation that, at the time of the shooting, the defendant had a valid Tennessee permit to carry a handgun.

Following deliberations, the jury convicted the defendant of the indicted offense of voluntary manslaughter.

## ANALYSIS

The sole issue the defendant raises on appeal is whether the evidence was sufficient to sustain his conviction. Specifically, he argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense in shooting the victim. The State responds by arguing that the proof, which showed that the defendant fired multiple gunshots at the unarmed victim, including a final gunshot after the victim was on the ground, was more than sufficient for a rational jury reasonably to reject the defendant's claim of self-defense. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson

-4-

v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2006 & 2010). Under the 2007 amendment to the self-defense statute,

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (Supp. 2008 & 2011).

When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See Tenn. Code Ann. § 39-11-201(a)(3) (2006 & 2010); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, it is within the prerogative of the jury to reject a claim of self-defense. Goode, 956 S.W.2d at 527.

Viewed in the light most favorable to the State, the evidence was sufficient for the jury to reject the defendant's claim of self-defense and to find him guilty of the voluntary manslaughter of the victim. Although there was proof that the victim was angry and that he approached the defendant in a belligerent manner, it was undisputed that he was unarmed at the time the defendant shot him. Moreover, according to Yelverton's trial testimony, the victim had his arms thrown open, which would have made it obvious to the defendant that he was unarmed, at the time that the defendant fired his first shots. We also note that Wiesner testified that the victim stopped when the defendant showed him his gun. Finally, Daniels described witnessing the defendant fire at least two shots at the unarmed victim, knocking him down onto the ground, before walking up to him and firing a final shot as he stood over his fallen body. From all this evidence, a rational jury could have reasonably rejected the defendant's claim of having acted in self-defense. We, therefore, affirm the defendant's conviction for voluntary manslaughter.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE